UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| DAVID ROBERT BOURGEOIS, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Civil No. 07-152-B-W |
| | ) | |
| STATE OF MAINE, | ) | |
| | ) | |
| Respondent | ) | |

**<u>RECOMMENDED DECISION ON 28 U.S.C. § 2254 PETITION</u>**

David Bourgeois was convicted by a jury on two counts, one of gross sexual

assault and one for unlawful sexual contact. He has filed a 28 U.S.C. § 2254 petition,

principally focused on the victim's competency to testify and, in a related vein, the

sufficiency of the evidence.  The State of Maine has filed a motion to dismiss the petition.

For the reasons below, I recommend that the Court deny Bourgeois 28 U.S.C. § 2254

relief.

*Discussion*

With respect to § 2254(d)(1)[1], this court reviews the decision of the Law Court

through the following lens:

---

[1]       Of course, 28 U.S.C. § 2254(d)(2) allows a petitioner to challenge factual determinations made by the state court and Bourgeois's sufficiency of the evidence claim could have been framed as such an attack in that Bourgeois is claiming that the State courts' determinations were based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. It may well be that 28 U.S.C. § 2254(d)(2) is the/an appropriate fulcrum for such a challenge as on, its face, a sufficiency of the evidence claim seems to be a prime candidate for subsection (d)(2).
        The Tenth Circuit reflected in <u>Hamilton v. Mullin</u>:
                We have not yet settled whether a challenge to the sufficiency of the evidence
                on a habeas petition is a question of fact or a question of law, and therefore whether 28
                U.S.C. § 2254(d)(1) or § 2254(d)(2) should apply. See <u>Turrentine</u>, 390 F.3d at 1197;

The "contrary to" category "embraces cases in which a state court decision directly contravenes Supreme Court precedent." <u>Mastracchio v. Vose</u>, 274 F.3d 590, 597 (1st Cir.2001) (citation omitted). The "unreasonable application category" includes cases in which the state court's decisions, while not "contrary to" relevant Supreme Court precedent, nonetheless constitute an "unreasonable application" of that precedent. <u>Id.</u>

The Supreme Court has said that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the [Supreme] Court on a question of law or if the state court decides a case differently than the [Supreme] Court has on a set of materially undistinguishable facts." <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000). The "unreasonable application" analysis, however, affords relief only if "the state court identifies the correct governing legal principle from the [Supreme] Court's decisions but unreasonably applies that principle to the facts of the petitioner's case." <u>Id.</u> at 413.

A state court <u>need not cite or be aware of Supreme Court precedents</u> so long as "neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U .S. 3, 8 (2002).

<u>Knight v. Spencer</u>, 447 F.3d 6, 11 -12 (1st Cir. 2006) (emphasis added).[2]

---

<u>Moore v. Gibson</u>, 195 F.3d 1152, 1176-77 (10th Cir.1999); <u>Torres v. Mullin</u>, 317 F.3d 1145, 1151 (10th Cir.2003). Section 2254(d)(1) governs questions of law and requires us to determine whether the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal Law." Section 2254(d)(2), in contrast, applies to questions of fact and asks whether the state court decision was "based on an unreasonable determination of the facts in light of the evidence presented." Despite the lack of clarity in this area, "we need not decide [the] question here because [the defendant] is not entitled to habeas relief under either standard." <u>Dockins v. Hines</u>, 374 F.3d 935, 939 (10th Cir.2004).

436 F.3d 1181, 1194 (10th Cir. 2006).  <u>See also</u> <u>Bruce v. Terhune</u>, 376 F.3d 950, 959-60 (9th Cir. 2004); <u>Garcia v. Carey</u>, 395 F.3d 1099, 1107 (9th Cir. 2005) (Wallace, Sen. Cir. J., dissenting).  However, <u>Hurtado v. Tucker</u>, 245 F.3d 7 (1st Cir. 2001) makes no mention of 28 U.S.C. § 2254(d)(2) and I proceed on the assumption that § 2254(d)(1) is the appropriate post-AEDPA provision for the analysis of a sufficiency of evidence claim.

[2]     The sequential organization of <u>Knight v. Spencer</u>, suggests that the failure to cite to the relevant Supreme Court precedent is not only not a hindrance to undertaking the "contrary to" analysis but would not prevent the federal court from proceeding with the 'unreasonable application' inquiry.  It twists the mind to attempt to comprehend how, if the state court opinion does not cite or demonstrate an awareness of the United States Supreme Court precedents, this court can in any measurable, meaningful way identify how the decision was an unreasonable application of a precedent not applied.  The <u>Early</u> discussion, on which the First Circuit draws in <u>Knight</u>, is pegged to the "contrary to" prong of the § 2254(d)(1) analysis.
    With respect to this concern, the First Circuit observed in <u>Hurtado v. Tucker</u>:

        A total failure by the state court to discuss any constitutional claim may mean that there was no such claim "adjudicated on the merits in State court proceedings." 28 U.S.C. § 2254(d) (West Supp.2000); <u>see</u> <u>Washington v. Schriver</u>, 240 F.3d 101, 107 (2d Cir.2001). Here, however, the state appeals court adjudicated Hurtado's claims on their merits. We do not reach the question of how to analyze whether there has been an

2

The two issues raised on direct appeal to the Maine Law Court were: 1) Did the trial court commit reversible error in determining that the victim was competent to testify; and 2) was the evidence at trial sufficient so that a reasonable fact finder could determine the defendant to be guilty beyond a reasonable doubt of the offenses charged.

As to these claims, the Maine Law Court ruled:

> Contrary to Bourgeois's assertion, the court's finding that the victim was competent to testify is supported by the facts in the record, cf. D'Angelo v. McNutt, 2005 ME 31, ¶ 6, 868 A.2d 239, 242, and exceed the standards set forth in State v. Ellis, 669 A.2d 752, 753 (Me. 1996) and State v. Rippy, 626 A.2d 334, 337 (Me. 1993).  Viewing the evidence in the light most favorable to the State, the trier of fact rationally could have found beyond a reasonable doubt every element of the offenses charged. See State v. Moores, 2006 ME 139, ¶ 7, 910 A.2d 373, 375.

(State Court Record App. B.)  While this analysis is sparse, in making the 28 U.S.C. § 2254(d)(1) evaluation of the state court's decision, I "do not focus on the quality of the court's reasoning but rather on the reasonableness of the outcome."  Ellen v. Brady, 475 F.3d 5, 9 (1st Cir. 2007) (citing Hurtado v. Tucker, 245 F.3d 7, 20 (1st Cir.2001).

First, the State is right that Bourgeois's first claim – concerning the competency of the victim/witness to testify – is, standing alone, a sub-constitutional claim that only has significance in the context of this 28 U.S.C. § 2254 petition as a component of his second ground, the sufficiency of the evidence as a whole to support his conviction.  Thus, I address his § 2254 petition as containing only one cognizable claim, but consider Bourgeois's argument concerning the victim/witnesses's competency in doing so.

---

"unreasonable application of" clearly established federal law where there is no state court analysis of the claims.
245 F.3d 7, 18 n.18 (1st Cir. 2001).
It may be that if there is no state court analysis of a claim (and, needless to say, no citation to the relevant Supreme Court precedent) the unreasonable application prong goes by the wayside and all that is left for a federal court to measure is whether or not the state court determination is contrary to Supreme Court precedent following Early.

With respect to Bourgeois's constitutional claim, in its memorandum the State notes that in an earlier case, Penman v. Berry, Civ. No. 06-113-B-W, 2006 WL 3931604 (D. Me. Jan. 18, 2006) affirmed 2007 WL 313398 (D.Me. Jan 30, 2007), involving a due process sufficiency of the evidence claim, I have addressed the question of what Supreme Court precedent governs the 28 U.S.C. § 2254(d)(1) inquiry.  In Penman  I reasoned:

> The State cites to the pre-AEDPA Jackson v. Virginia, 443 U.S. 307 (1979) as the Supreme Court precedent setting forth the clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1) for a due process claim of this ilk. Actually, Jackson is a case that declared that federal courts reviewing state court's sufficiency claims should apply the In re Winship, 397 U.S. 358 (1970) standard in the federal habeas proceeding. In re Winship "explicitly" held, "that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." 397 U.S. at 364 (emphasis added). Jackson put to rest a more deferential federal habeas standard that required only that there be "any evidence to support a state-court conviction" 443 U.S. at 312-13. Whereas the state court reviewing a jury verdict would apply In re Winship, for this Court, in reviewing a state court In re Winship-moored sufficiency of the evidence determination, Jackson is a guide for federal courts which must follow its directive that "the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." 443 U.S. at 324

2006 WL 3931604 at *5.  That opinion included the following footnote:

> Addressing a 28 U.S.C. § 2254 insufficiency of the evidence challenge the First Circuit in Hurtado v. Tucker explained:
>> The Court's holding in Jackson represented an extension of its previous decision in In re Winship, 397 U.S. 358, 364(1970), that due process requires that a conviction be supported by proof beyond a reasonable doubt. The Jackson standard must be applied with specific reference to the elements of the offense as defined by state law. See Campbell v. Fair, 838 F.2d 1, 4 (1st Cir.1988).
> 245 F.3d 7, 12 n.8 (1st Cir. 2001).
> The Jackson Court turned to the evidence in the case before it and rejected "the petitioner's claim that under the constitutional standard dictated by Winship his conviction of first-degree murder cannot stand." Jackson, 443 U.S. at 324;  see also id. at 318 ("After Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal

4

> conviction must … to determine whether the record evidence could
> reasonably support a finding of guilt beyond a reasonable doubt.").
>  In light of Hurtado's approach, in this opinion I refer to the precedents governing
> my review as In re Winship/Jackson.

Id. at *5 n.3.   Not having located any subsequent precedent that warrants revisiting this

approach, I stand by this analysis.

With respect to the sufficiency of Bourgeois's efforts to present his federal

constitutional claims to the Maine courts, in his brief to the Law Court, Bourgeois cited

to both Jackson and In re Winship in arguing his second ground.  Furthermore, in

Jackson, the United States Supreme Court explained: "Under the Winship decision, it is

clear that a state prisoner who alleges that the evidence in support of his state conviction

cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt

beyond a reasonable doubt has stated a federal constitutional claim." 443 U.S. at 321; see

also id. at 322 n.15.  In short, this case does not raise a concern about which holding of

the United States Supreme Court the state court should have applied given the nature of

the claim.  Compare, Carey v. Musladin, __ U.S. __, 127 S. Ct. 649 (Dec. 11, 2006).

### *Contrary to* **In re Winship/Jackson**?

In Hurtado v. Tucker, 245 F.3d 7 (1st Cir. 2001) the First Circuit

addressed an insufficiency of the evidence claim. As to the 'contrary to' determination,

the First Circuit explained:

> Here, the [Massachusetts] Appeals Court applied the correct
> standard by articulating the standard set forth in Jackson. Indeed, this case
> presents a good example of one to which § 2254(d)(1)'s "contrary to"
> prong does not apply: "a run-of-the-mill state-court decision applying the
> correct legal rule from [the Supreme Court's] cases to the facts of a
> prisoner's case." Williams [v. Taylor], 529 U.S. [362,] 406 [(2000)].
> Because this case is therefore not properly analyzed under the "contrary
> to" standard, we turn to "the second step of the requisite analysis: whether

5

the state court decision constitutes an unreasonable application of clearly
established Supreme Court case law." Williams v. Matesanz, 230 F.3d at
426.

Id. at 15.

The Maine Law Court expressly referred to a sufficiency of the evidence standard

and cited to State v. Moores, 2006 ME 139, ¶ 7, 910 A.2d 373, 375.   Moores involved a

similar sufficiency of the evidence challenge by a defendant convicted of unlawful sexual

contact and assault.  With respect to the 'contrary to' prong of 28 U.S.C. § 2254(d)(1),

Bourgeois's case is not distinguishable from the insufficiency claim lodged in Hurtado;  it

is "a run-of-the-mill state-court decision applying the correct legal rule from [the

Supreme Court's] cases to the facts of a prisoner's case." Williams, 529 U.S. at 406.[3]

### *Unreasonable Application of*  In re Winship/Jackson?

Hurtado offers the following assistance to lower courts undertaking the

unreasonable application inquiry[4] vis-à-vis an insufficiency-of-the-evidence claim:

> Williams [v. Talyor, 529 U.S. 362 (2000)] and our own precedent
> … suggest the following guidelines as to some, but not all, of the

---

[3]       As I did in Penman, I rely on Hurtado to assist the adjudication of this claim through the 28 U.S.C.
§ 2254(d)(1) prism and not as a source of clearly established Supreme Court law under that subsection.  See
Carey v. Musladin, __ U.S. __, __, 127 S. Ct. 649, * 652-54 (Dec. 11, 2006).

[4]       Again, as in Penman, I jump directly to the unreasonable application analysis. It is worth
reiterating my reasons for doing so.

 In Hurtado, the First Circuit, preliminary to its discussion of the unreasonable application analysis
of a 28 U.S.C. § 2254 insufficiency of the evidence challenge, indicated:

> Habeas review involves the layering of two standards. The habeas question of whether
> the state court decision is objectively unreasonable is layered on top of the underlying
> standard governing the constitutional right asserted. Here, that constitutional right is
> governed by Jackson's test of "whether, after viewing the evidence in the light most
> favorable to the prosecution, any rational trier of fact could have found the essential
> elements of the crime beyond a reasonable doubt." 443 U.S. at 319 (emphasis in
> original). In a particular habeas case, it may be useful, although not mandatory, to review
> first the underlying constitutional issue, here the [In re Winship/Jackson] question.

245 F.3d at 16.  In a footnote to this passage, the First Circuit reflected: "As one commentator has noted, "it
is doubtful that state judges really prefer that federal courts spend their time asking not whether state court
judgments are wrong, but whether they are unreasonably wrong." Id. at 16 n.15 (quoting  Larry W. Yackle,
The Figure in the Carpet, 78 Tex. L. Rev. 1731, 1756 (2000)).

principles in an insufficiency-of-the-evidence case to be used in making
the evaluation of "objective unreasonableness" under § 2254(d)(1):

(1) The focus of the inquiry is on the state court decision;

(2) Even with the deference due by statute to the state court's
determinations, the federal habeas court must itself look to "the totality
of the evidence" in evaluating the state court's decision;

(3) The failure of the state court to consider at all a key argument
of the defendant may indicate that its conclusion is objectively
unreasonable; however, the paucity of reasoning employed by the state
court does not itself establish that its result is objectively unreasonable;

(4) The failure of a state court to give appropriate weight to all of
the evidence may mean that its conclusion is objectively unreasonable;
and

(5) The absence of cases of conviction precisely parallel on their
facts does not, by itself, establish objective unreasonableness.

245 F.3d at 18.

As  with other weight-of-the-evidence complaints, relying on the precedents at

hand, it is clear that this court must not, in the context of a 28 U.S.C. § 2254 sufficiency-

of-the-evidence review, nit-pick the evidence for weaknesses in the State's proof to

identify how a fact-finder might have reached a different conclusion. The In re Winship

"inquiry does not require a court to 'ask itself whether it believes that the evidence at the

trial established guilt beyond a reasonable doubt.'" Jackson, 443 U.S. at 318-19 (quoting

Woodby v. INS, 385 U.S. 276, 282 (1966)) (emphasis added). "Instead, the relevant

question is whether, after viewing the evidence in the light most favorable to the

prosecution, any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." Id. (citing Johnson v. Louisiana, 406 U.S. 356, 362 (1972)).

### The Evidence

Bourgeois was tried over the course of two days.  The State rested its case after

presenting three witnesses: the alleged victim, Bourgeois's daughter, who was eight-

years-old at the time of her testimony (Trial Tr. 3, 34) and was five during the great

majority of the period of the alleged abuse (id. at 23, 52)[5]; Robin Patrick Parker, the

police detective who investigated the case and interviewed the victim (id. at 67); and

Lawrence Ricci, a physician and director of a child abuse program, who did the medical

examination of the victim (id. at 85-88).

Prior to the victim's trial testimony the court addressed a motion in limine and

counsel questioned the victim in a voir dire session that explored her competency to

testify to the events in question.  (Id. at 2- 21.)  After the trial court asked a few questions

of its own, (id. at 21-22), defense counsel, relying on State v. Rippy, 626 A.2d 334

(1993), argued that the victim had been prompted in her recollections and was not

"competent to testify based on her inability to remember basic facts" (id. at 22).  The

prosecutor argued to the contrary.  (Id. at 23-24.  The trial judge ruled:

> [State v. Rippy] clearly states what the law is in this area, and the section
> of the rules of evidence that apply to whether or not the person is
> competent, knows right from wrong.  I believe, first of all, that she does –
> is able to distinguish right from wrong.
>    One of the other components of that rule is to whether or not she
> can remember – is competent to remember what happened.
>    The Rippy case is much different where we have a psychologist
> who said she was operating at the intellect of a two-and-a-half-year-old.
>    In this case, first of all, the demeanor of the witness impresses the
> court that she seemed to understand what was going on and seemed to be
> able to explain, and also explained when she could not remember.  She
> was very definite about that.  She was very definite about the things she
> could remember and the things she couldn't remember.  Now, a lot of that
> goes to the weight of her testimony.  And the vagueness of some of her
> responses – In some areas she was very specific.  She remembered the
> bicycle on one of her birthdays.  She remembered where she was living in
> Norridgewock before and after.  I know that it doesn't pinpoint the exact
> date, but it gives a period of time within which everybody can operate to
> determine when these things happened, so she was definite about that.
>    Although she couldn't remember the movies that were on, why she
> was shocked, she did remember walking in, about what happened, and she
> didn't try to say anything detrimental.  She said she couldn't remember.

---

[5]    The indictment alleged acts between July 1, 2002, and July 31, 2003; the victim was born on July
15, 1997.  (Id. at 23.)

Now, the testimony also established that she talked to the assistant district attorney several times and talked about what happened. That certainly is subject to cross-examination and goes to the weight of the testimony. It may weigh on her credibility as to what she can remember, but I cannot, at this point, find that she is just incompetent as a witness. I think there are some things that I'm sure will be brought out in cross-examination that will go to her weight. So, for that reason, I'm going to find that – based on my observing her and some of her answers, find that she does have the ability to tell right from wrong and does have the ability to remember the things that happened between her and her – her father when she was five years old and into when she was six years old.

(Id. at 25-27.)[6]   After the victim/witness testified the defense renewed its challenge to her competency to testify and the court again considered it an issue of credibility rather than admissibility. (Id. at 64-65.)

The key portion of the victim's testimony in front of the jury was as follows:

Q.    Okay. Now, … Do you know what a bad touch is?
A.    Yep.
Q.    What's a bad touch?
A.    Like someone touching you where they're not supposed to, like in your vagina or on your penis.
Q.    Okay.  Where did you learn about good touches and bad touches?
A.    I learned them from my caseworker.
Q.    Your caseworker taught you about them?
A.    (Witness nods head)
Q.    Okay.  Did you used to have words that you referred to for your vagina, another word?
A.    My body.
Q.    Your body, you used to call it?  Okay.  Did you ever call it your pee pee?
A.    I don't remember.
Q.    Okay.  Now you use the word vagina?
A.    Um-hum.
Q.    All right.  Has anyone ever given you a bad touch on your vagina?
A.    Yes.
Q.    Who was that?
A.    My birth dad.

---

[6]    I take the time to set this well-reasoned decision out in full because Bourgeois has attempted to assert a separate challenge to this ruling; a challenge that I have concluded cannot stand as an independent 28 U.S.C. § 2254 claim, but must be subsumed within his sufficiency of the evidence constitutional claim. It is evident based upon the victim's voir dire testimony that the trial court's factual findings on competency would be irreproachable under 28 U.S.C. § 2254(d)(2), especially in light of the § 2254(e)(1) presumption.

Q.      Okay.  David?
A.      Yep.
Q.      Do you remember what room you were in when that happened?
A.      Yes.  His room.
Q.      His bedroom?
A.      Yes.
Q.      Okay.  Who was home?
A.      My dad.  That's all.
Q.      Okay.  Where were you in his bedroom?
A.      On the bed.
Q.      Were you wearing clothes?
A.      No.
Q.      What happened to your clothes?
A.      He took them off.  He made me take them off.
Q.      He made you take them off?
A.      Um-hum.
….
Q.      Okay.  What did he touch you with?
A.      His penis and his hand.
Q.      Okay.  When he touched your front private part, was that with your hand—his hand?
A.      Yes.
Q.      Okay.  When he touched your vagina, it was with his hand.  Is that correct?
A.      Yes.
Q.      All Right.  Did his fingers go inside or were they just on the outside?
A.      They were just on the outside.
Q.      Okay.  How did you feel when he was touching your vagina?
A.      It didn't feel very good.   I was – I just didn't want him to touch me anymore.
Q.      Okay.  Did you tell him not to touch you?
A.      Yes.
Q.      Did he stop?
A.      No.
Q.      How many times did David touch you on your vagina with his hand?
A.      I don't remember that.
Q.      Okay.  Do you remember the one time you told us about?
A.      Yeah, I remember that one time, but I don't know, like, how many times.
Q.      Okay.  Did you ever have any other bad touches?
A.      Um-hum.
Q.      What was another bad touch you had?
A.      He touched me with his penis.

10

Q.      Okay.  And when he touched you with his penis, was that – what room were you in?

A.      His bedroom, on his bed.

Q.      Okay.  How were you on his bed?

A.      I was lying down with my face towards the bed, face first.

Q.      So, you were laying on your belly?

A.      Yeah.

Q.      All right.  And where was David?

A.      He was on the bed too.

Q.      Okay.  Was he lying next to you?

A.       No

Q.      Where was he on the bed?

A.      He was, like, sort of laying on top of me.

Q.      Okay.  Was his whole body touching you when he was on top of you?

A.      I don't remember that, but I only remember he touched me with his penis.

Q.      Okay.  Where did his penis touch you?

A.      On my butt.

Q.      Okay.  When you say it was on your butt, was it on the outside?

A.      No.  It was inside.

Q.      It was inside?

A.      (Witness nods head)

Q.      You could feel that?

A.      What?

Q.      You could feel that?

A.      Yeah.

Q.      How did it feel?

A.      It didn't feel very good.  It hurt.

Q.      When he put his penis there, did he just put it there and just stay there?

A.      No.

Q.      What did he do?

A.      He kept—he kept going up and down.

Q.      Okay.  When he was going up down, did his penis move?

A.       Yes.

Q.      How long did that happen?

A.      I don't know.  A long time.

Q.      A long time?

A.      Yeah, but I don't know how long.

Q.      Okay.  Did you tell him to stop?

A.       No.

Q.      How many times did David do this to you?

A.      I think it was several times.

Q.      Several times?  You can remember several different times he did it?

A.      Yeah, but I – I remember the same thing.  He did it, the same thing, several times.

….

Q.  Okay.  When you went into [David's] room and you had clothes on, what happened to your clothes?

A.      He made me take them off.

Q.      Okay.  When he was done, when he stopped moving, what happened?

A.      Well, when he stopped moving and he was – and the process was all done, he made me put on – he made me put my clothes back on.

Q.      Okay.  Did he ever say anything to you?

A.      Yes.

Q.      What did he  ---

A.      He told me not to tell anybody because he knew he was going to get into trouble like he is right now.

Q.      Was there a third type of bad touch?

A.      Yes.

Q.      Okay.

A.       He touched me with his tongue.

Q.      What room were you in when he touched you with his tongue?

A.      I was in the bedroom on the bed.

Q.      Okay.  Where were you lying with your – on your belly?

A.      No.  I was laying on my back.

Q.      You were laying on your back?  Where was David?

A.      He was not the floor.  He was, like, kneeling.

Q.      Kneeling on the floor?

A.      Um-hmm.

Q.      Was he away from the bed or close to the bed?

A.      He was close to the bed.

Q.      Okay.  And then what happened?

A.      He started to – he started to touch me.

Q.      Okay. And you said it was with his tongue?

A.      Um-hmm.

Q.      Could you feel that?

A.      Um-hmm.

Q.      How many times did he touch you with his tongue?

A.      I don't remember.

Q.      How long did it happen?

A.      I don't remember that, but I know it took a long time.

Q.      Okay.  When – when he was done touching with his tongue, did he say anything to you?

A.      Huh-uh.

Q.      No?

A.      I don't remember that, if he did.

(Trial Tr. at 40-48.)  The victim also recalled that Bourgeois told her "not to trust the police officers" after she had spoken with a police officer.  (<u>Id.</u> at 48-49.)

On cross-examination, the defense attorney focused on questions aimed at eliciting the victim's admission that her memory of the time in question was sketchy (<u>id.</u> at 51-53);  that "grown-ups helped her remember things" prior to her testimony (<u>id.</u> at 53); that when she was seven the caseworker had told her what her father had done to her (<u>id.</u> at 54-55);  and that, as she sometime had trouble "staying clean in her private areas," her father would at times touch her there to see if she was clean, making her uncomfortable  (<u>id.</u> at 55-56).  On cross the victim/witness also testified that she saw Bourgeois lick her birth mother's vagina and, in fact, was on the bed when this occurred.  (<u>Id.</u> at 58-59.)  Questioned about whether or not she would have told the truth to a child abuse counselor, defense witness Karla Gagne, the victim/witness responded: "Yeah.  I would tell anyone the truth, anyone in this whole room."  (<u>Id.</u> at 59.)

With respect to the victim/witnesses's indication that she was told what was done to her, on redirect she testified that what she was told was what she had already related about her father's conduct.  (<u>Id.</u> at 61.)  The prosecutor also questioned her on her testimony that Bourgeois had touched her to check whether or not she was clean, and she testified that when he did this "check" he had her take off all her clothes and she was told to lay on the bed.  (<u>Id.</u> at 63-64.)

Robin Patrick Parker was the police detective who conducted the investigation into this matter and twice interviewed the victim.  (<u>Id.</u> at 67.)  He indicated that the victim was "obviously nervous" – very nervous and very uptight -- during the initial July 2003 courthouse interview with him, at which the victim witness advocate, Pam Mitchell, was

present.  (Id. at 67-69.)  She was a reluctant interviewee and she finally said that her

father had touched her in "a very vague statement."  (Id. at 70.)   At this first interview he

asked her to draw a picture and she drew a picture of her and Ms. Mitchell.  (Id. at 70-

71.)  Upon the Detective Parker's request she put a dot where her father had touched her.

(Id. at 71.)  At this juncture Parker terminated the interview, it being apparent that the

victim did not want to talk anymore and he did not want to risk a situation in which she

would say something just to get the interview over with.  (Id. at 71-73.)   Parker then

testified concerning his second interview of the victim.  He described her demeanor as

"much more relaxed"(id. at 78-79); explaining, "It was apparent just by looking at her

that she was more comfortable and that she was able to speak a little more

candidly…."(id. at 79).  The prosecutor then successfully moved for the admission of

Parker's interview report (id. at 80), a report that neither party had provided this court.

The cross-examination was limited to probing how unfamiliar the victim was with the

courthouse, Parker, and Pam Mitchell during the first interview and a reiteration that the

victim was nervous during this interview and was asked questions about her private

matters.  (Id. at 80-81.) The re-cross was limited to emphasizing that during the first

interview the victim had indicated the front of the genital area on her picture of the girl

and that all that this signified was that her father touched her there with his hand.  (Id. at

83-84.)

    The State then called Doctor Lawrence Ricci, the director of the Spurwink Child

Abuse Program, a child abuse evaluation and treatment center.  (Id. at 84-85.)    Ricci

conducted a "head-to-toe" physical examination of the victim on November 4, 2003, to

determine if there was "any evidence of injuries of any kind … particularly focusing on

the genital and rectal area because concerns had been raised about possible sexual abuse."
(<u>Id.</u> at 87.)  Ricci explained that he found no evidence of any trauma to any part of her
body, including the rectum.  (<u>Id.</u> at 88.) Ricci testified that the absence of trauma to the
rectal area did not necessary mean that nothing happened to the victim.  (<u>Id.</u> at 88-89.)
He elaborated that there could have been no injury at any time if the touching did not
produce any injury; that the "rectum is a fairly stretchable tissue in general, and, so, there
could even be slight penetration of the rectum with no injury"; and that there could have
been injury that entirely healed and left no residual findings, much like an injury to the
mouth would heal.  (<u>Id.</u> at 89.)[7]  Asked whether there are always scars with rectal injuries
or trauma, Ricci replied:  "There are only, on occasion, scars, and I would say that would
be an infrequent finding for the most part."  (<u>Id.</u> at 90-91.)  On cross-examination Ricci
clarified that there was no evidence of any healed injuries and that the evidence was
"consistent with either sexual abuse or no sexual abuse"; it was "noncontributory."  (<u>Id.</u> at
93.)

 Such was the State's case as tested by the defense.

 The defense relied on four of its own witnesses: Michelle Whall, who is the
victim's birth mother and was living with Bourgeois and her daughter at the relevant time
(<u>id.</u> at 97-98);  Katie Danforth, a young woman who was the teenage confidant of the
victim (<u>id.</u> at 116); Robert Underwood, a physician's assistant who examined the victim
in June 2003, for a suspected yeast infection  (<u>id.</u> at 120-22); and Karla Diffin, at the time
was Karla Gagne, who conducted two interviews of the victim in her capacity as a
counselor for the Spurwink Child Abuse Program (<u>id.</u> at 143-44).  The defense also

---

[7] Bourgeois's daughter was removed from his household on July 25, 2003.  (<u>Id.</u> at 135.)

recalled Robin Patrick Parker (id. at 103), and Bourgeois took the stand in his own defense (id. at 128).

Whall testified that in June 2003 she took her daughter to see Robert Underwood, the physician's assistant, to be checked out because her daughter had symptoms which Whall thought were consistent with her history of urinary track and yeast infections. (Id. at 98.) Underwood advised Whall to check her daughter carefully for hygiene when she was in the bathroom and to clean the area if there was a problem. (Id. at 98.) She indicted that she made Bourgeois aware of this advice. (Id. at 99.) Then she told as how, sometime after that, Katie Danforth came and told Whall that the victim had confided that Bourgeois "had touched her and made her uncomfortable". (Id.) There was a meeting with Danforth, Bourgeois, Whall, and the victim and Bourgeois agreed not to examine his daughter's genital area anymore and that Whall would assume sole responsibility for this task. (Id.) Neither Whall nor Bourgeois punished their daughter for speaking to Danforth about this. (Id. at 100.) Whall indicated on cross that Underwood did not prescribe any type of medication. (Id. at 101.) She also related that she would usually conduct these exams of her daughter in the bathroom after her daughter had used the toilet, her pants being already down, and that there was no reason for her daughter to remove her shirt. (Id. at 102.)

Called back to the stand by the defense, Robin Patrick Parker was questioned on his investigation that commence on July 25, 2003. Defense counsel questioned Parker about the fact that in his first interview with the victim she only indicated that her father had touched her in the "pee pee area with his hand" and not that he had licked her vagina or put his penis in her butt. (Id. at 106-07.) Parker indicated that he avoided asking

pointed question containing such descriptions to avoid influencing her.  (Id. at 109 -10.)

With regards to the second interview, which occurred on December 22, 2003, Parker

testified that he conducted the second interview after being told that the victim had more

to say and that she did then tell him of the three separate types of contact.  (Id. at 110.)

On cross-examination it was revealed that Bourgeois had told Parker at his July 25, 2003,

interview that he had no time or energy for sex, even though he did not work, but that he

offered that he did have sex with Whall two weeks earlier.  (Id. at 112.)  Bourgeois had

also told Parker that he slept naked and that his daughter would climb into bed, take off

her clothes, and that he would cuddle up next to her.  (Id. at 111-12.)  With regards to the

December 22, 2003, interview with the victim, Parker explained that the specifics of the

contact came gradually but that the victim was very direct and that she told him that there

were instances on the bed in which neither she nor her father were wearing clothing and

that she finally came to the point of describing how her father put "his penis on her – in

her butt," and was "[s]haking it while she's lying face down on his bed without any

clothing on."  (Id. at 114-15.)

The victim's confidant, Katie Danforth testified very briefly during the defense's

case.  She described how in the summer of 2003 she and the victim were at the

Bourgeois/Whall house laying out in the sun and the victim talked to her about her father.

(Id. at 116.)  The victim told Danforth "that she felt uncomfortable about her dad

touching her" and that "there was medication being put on."  (Id. at 116-17.)  Danforth

told Bourgeois and Whall and she recalls that the parents talked about this with their

daughter in Danforth's presence but she did not remember what was said.  (Id. at 117.)

On cross-examination, Danforth clarified that she recalled that the victim was the first to

tell her that medication was being applied but that Whall also told her about the medication.  (Id. at 118-19.)

Robert Underwood's testimony for the defense was unremarkable.  As a physician assistant who saw the victim in June 2003 because her mother thought she had a yeast infection.  (Id. at 122.)   He told Whall that if her daughter was complaining about itching or irritation to check and see if there were little particles of toilet paper in her folds and, if so, to rinse them out.  (Id. at 123.)   He did not specifically instruct that this inspection would require that the lips of the labia be folded back but acknowledged that this would be a necessary step to succeed in the inspection.  (Id. at 124.)  On cross-examination Underwood indicated that the victim was uncooperative, refused to give a urine sample, had neither a rash nor discharge, had no discomfort urinating, and was only complaining of "a little bit of itching."  (Id. at 124-25.)  He was confident, based on his notes and recollection, that he did not prescribe any ointment or other type of medication. (Id. at 126.)  Underwood also acknowledge that for purposes of inspecting the area there would be no reason to have the child take off her shirt or for the inspecting parent to have no clothes on.  (Id. at 127.)

Karla Diffin conducted two interviews of the victim in her capacity as a counselor for the Spurwink Child Abuse Program and she was the last witness to testify at the trial. She interviewed the victim in September 2003, when Diffin was still conditionally licensed as a clinical profession counselor.  (Id. at 144.)  In Diffin's first interview with the victim the victim did not admit that there had been any sexual abuse.  (Id. at 146.) During the second interview Diffin showed the victim two playhouse dolls.  (Id.)

Q.      What did you ask her to do with the dolls?

A.      I had asked her to identify the eyes, ears, nose, mouth, hands, and legs, and also had asked her to identify the place on a female doll where the pee comes from, which she identified as the vagina, and the place with the male doll where pee comes from, which she identified as the penis, and the place on the dolls where poop comes from, which she identified as the butt.

Q.      What's the next question you asked?

A.      I asked her, "Has somebody tickled you?"

Q.      Had the two of you talked about her being tickled?

A.      Yes.

Q.      And did you ask her a question specifically about her vagina?

A.      Yes, I did.

Q.      What was that question?

A.      "Has somebody done something to your vagina?"

Q.      What was her answer?

A.      "No, only but me."

Q.      Then what did you ask?

A.      "What do you do to your vagina?"

Q.      Her answer?

A.      "Sometimes when it's itchy, I scratch it."

Q.      Your next question?

A.      Has somebody touched your vagina with their hand?"

Q.      Her answer?

A.      "No."

Q.      What was your next question?

A.      "Has somebody put lotion on your vagina?"

Q.      Her answer?

A.      "No."

Q.      Your next question?

A.      "Has somebody put their mouth on your vagina?"

Q.      Her answer?

A.      "No."

Q.      Your next question?

A.      "Has somebody made you do something to their penis?"

Q.      Her answer?

A.      "No."

Q.      Your next question?

A.      "Has somebody done something to your butt?"

Q.      Her answer?

A.      "No."

Q.      Shortly after that, you asked her about her father. ….

A.      Um-hmm, yes.

Q.      What did you ask?

A.      "You said your dad did something to your body.  What part of your body?"

Q.      And what did she say?

> A.      "My vagina."
> ….
> Q.      And then, what was your next question?
> A.      "What did he do something with?"
> Q.      Her answer?
> A.      "His hand."
> Q.      And then, what was your next question?
> A.      "What were you wearing?"
> Q.      Her answer?
> A.      "A dress."
> Q .     Your next question?
> A .     "Where were you?"
> Q.      And her answer?
> A.      "I was inside."
> Q.      Your next question?
> A.      "Inside where?"
> Q.      Her answer?
> A.      "My house."
> Q.      Your next question?
> A.      "What room were you in?"
> Q.      Her answer?
> A.      "My dad's room."
> Q.      Your next question?
> A.      "Who was in the room with you?"
> Q.      Her answer?
> A.      "My dad."

(Id. at 146-50.)  Diffin then explained that the victim's testimony as to her dad waking her up prior to this encounter was confused, as was her description of her pajamas as a dress. (Id. at 150-52.)

This testimony in direct examination was a bit equivocal.  However, on cross – examination the prosecutor was able to draw out information about Diffin's interviews with the victim that buttressed the State's case.  For instance, beginning with exploring the victim's non-receptivity in her discussions with Diffin, Diffin explained that she asked the victim if she knew why she was there:

> Q.      What did she say?

> A.      "Well, my dad – my dad—Me and my dad, we were doing
> something bad.  My dad was doing something bad to me, and I didn't want
> him to do it anymore, but he kept doing it."
> Q.      So, she actually told you that she and her dad were doing
> something bad to her, or doing something bad?
> A.      Doing something bad, yes.
> Q.      Okay.  And you then asked her what he did?
> A.      Yes.
> Q.      And what did she say?
> A.      "That's what I'm trying to tell you.  I don't want to tell you."
> Q.      You asked her, "How come you don't want to tell me?"
> A.      Yes.
> Q.      What did she say?
> A.      "Because I'm scared."
> Q.      You asked her, "How come you're scared?"
> A.      Yes.
> Q.      What did she say?
> A.      "Well, um, because I don't want you to know what my dad did."
> Q.      Did you ask her, "How come you don't want me to know what
> your dad did?"
> A.      Yes.
> Q.      What did she respond?
> A.      "He did something with his body, and I don't want to tell."

(Id. at 155-56.)

As indicated earlier, Bourgeois elected to testify.  He described his version of

events related to the need to monitor his daughter's hygiene after she returned from her

visit to Underwood.  He said that Whall came home with instructions "to keep her clean,

that she might not be wiping or she might be wiping too much, and that we needed to

check her out on a daily basis, at least, and make sure that she was kept clean."  (Id. at

128-29.)

> Q.      Did you examine her on a daily basis, or at least fairly frequently?
> A.      Yeah.  I would take – When she would go in the bathroom, go to
> the bathroom, get ready to take a shower, I made sure that – I'd check her,
> say, "Okay.  You're clean.  Take a shower.  Make sure that you're clean.
> When you get out, make sure everything is scrubbed clean."  So….
> Q.      Did you also check her after she had been on the toilet?
> A.      Yes.  It was between the toilet and the shower.

> Q.      Did you ask her to take her clothes off so that you could examine her in this way?
> A.      Well, there were times before she went into the shower, if she didn't go to the bathroom first, I would've asked that.
> Q.      Now, how long did this routine go on?
> A.      Well, I'm going to say it was about two weeks.  It was some time, maybe a week before we brought her to Underwood, because this had occurred before and we kind of knew the symptoms and knew what to check.

(Id. at 129-30.)  He described the conversation with Diffin about his daughter's report that he had touched her and made her uncomfortable.  (Id. at 130-31.)  According to Bourgeois, his daughter said to him:  "When you have to check me to make sure that I'm clean, I don't like it and it makes me feel uncomfortable."  (Id. at 131.) He indicated that they agreed that Whall would assume this monitoring responsibility and that they did not punish or threaten their daughter as a consequence of her disclosure.  (Id. at 131-32.) Bourgeois reported that there were earlier times when he had to clean his daughter's private areas and that she had a history of poor hygiene.  (Id. at 132.)   He said that he had at times applied cortisone -- which he had on hand for his eczema -- to ease her itching (id.) and had applied diaper rash ointment and Gold Bond for her diaper rash (id. at 132-33.)  Bourgeois denied being at all aroused or sexually gratified when he touched his daughter's genital area.  (Id. at 133.)  He denied every licking her vagina or putting his penis in her butt.  (Id. at 133-34.)  He stated that his daughter did walk in on Bourgeois and Whall having sexual intercourse, once when he was performing oral sex on Whall and Bourgeois was at the end of the bed, and he insisted that his daughter was not on the bed at the time.  (Id. at 134-35.)  He indicated that during July of 2003 he had been taking Paxil for about a year and his sexual energy "dropped right off."  (Id. at 135.)   On cross-examination Bourgeois testified that his daughter would come naked into his

bedroom when he was sleeping nude and get into bed with him and that he would be alone with her like this if Whall was at work or up late watching a movie.  (Id. at 137.)

The jury began its deliberation at 10:34 a.m., sent one note to the trial judge, and the verdict was returned at 12:00 noon.  (Id. at 180.)

It is evident from a review of the entire trial transcript that a rational fact-finder in Bourgeois's trial could have concluded that the State had proven beyond a reasonable doubt that Bourgeois was guilty of gross sexual assault and unlawful sexual contact. See Jackson, 443 U.S. at 318 ("After Winship the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must … to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.").  The jury was faced with weighing the credibility of the victim/witness and Bourgeois and, given the jury's truncated deliberations, it appears that they had little difficulty crediting the testimony of Bourgeois's daughter.  Beyond Bourgeois's insistence that he only touched his daughter for purposes of monitoring his daughter's hygiene, the defense relied heavily on the victim's denial of certain contact in her interview with Diffin.  However, the prosecutor successfully undercut the thrust of this portion of Diffin's testimony and, in view of the other evidence supporting the State's case, it is not surprising that Diffin's testimony did not turn the tide for the defense.   Based on the above, I conclude that the Maine Law Court's "reasonable doubt" determination is not an unreasonable application of In re Winship under Jackson.

***Bourgeois's Pending State Petition for Post-conviction Review***

The above discussion thoroughly addresses the merits of the claims of Bourgeois's 28 U.S.C. § 2254 petition.  For the sake of future clarity, it is worthwhile to note here that

in his petition Bourgeois indicated that he had a pending petition for state post-conviction review that contained twenty-three counts.  On October 4, 2007, I issued a procedural order that noted this pending petition and cautioned:

> If this allegation is accurate that petition would toll the federal statute of limitation while it is properly pending in the state court.  If this court proceeds to adjudicate the merits of the two claims he alleges are fully exhausted, petitioner will then most likely be unable to bring a second or subsequent petition in this court as to those other claims.

(Procedural Order at 1, Docket No. 5.)  Bourgeois responded to that order immediately, indicating:

> After careful consideration of the issue stated in the above procedural order, and after close review of the 23 grounds pending post conviction review, it is clarified that:  David Robert Bourgeois, petitioner in the above named case, clearly states that he wishes to proceed, effective today, with his petition under Title 28, United States Code, Section 2254 for writ of habeas corpus by a person in state custody.
>
> Petitioner also wishes to state that, while he does not for[e]see filing a suc[c]essive petition containing the grounds in the state post conviction review, any subsequent petition filed would be strictly limited by the Petitioner to a maximum limit of no more than two grounds.  The Petitioner clearly understands that any subsequent petition will most likely be unable to be accepted by this court.

(Oct. 8, 2007, Letter at 1, Docket No. 7.)

### *Conclusion*

Accordingly, I recommend that the Court deny Bourgeois 28 U.S.C. § 2254 relief.

### <u>NOTICE</u>

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, within ten (10) days of being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.

       Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

November 29, 2007.

                         /s/ Margaret J. Kravchuk
                         U.S. Magistrate Judge